UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SUPERWOOD CO. LTD., | CASE NO. C12-1109JLR |
| Plaintiff, | FINDINGS OF FACT AND |
| v. | CONCLUSIONS OF LAW |
| SLAM BRANDS, INC., et al., | |
| Defendants. | |

This matter came before the court for a bench trial on September 23-27, 2013. Plaintiff Superwood Co. Ltd. ("Superwood") was represented by Mr. Eric Zubel; Defendants Slam Brands, Inc. ("Slam Brands") and Jason Lemelson (referred to collectively as "Slam Brands") were represented by Mr. Stephen Willey and Ms. Michele Stephen. The court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel. The court has weighed the testimony, exhibits, and evidence. Now, being fully advised, the court makes its Findings of Fact and Conclusions of Law as follows:

ORDER- 1

# I.  FINDINGS OF FACT

**A.  Admitted Facts**

The parties admit the following facts contained in the Pretrial Order, paragraphs 1 through 60:

## Background

1.  Superwood is a manufacturer of furniture with its manufacturing facility located in Lianjiang City, Guangdong, China.  (Pretrial Order (Dkt. # 105) ¶ 1.)

2.  Jason Lemelson is the founder and President of Slam Brands.  (*Id.* ¶ 2.)

3.  Mr. Lemelson formed Slam Brands in December 2000 to design, import and distribute home furnishing products for major retailers such as Costco, Target, and Wal-Mart.  (*Id.* ¶ 3.)

4.  Slam Brands was formed as a Washington C corporation in 2000.  In or about 2007, Slam Brands was converted to a sub-Chapter S corporation.  Mr. Lemelson has always been and remains Slam Brands' sole shareholder.  (*Id.* ¶ 4.)

5.  Slam Brands sourced vendors online through a number of sources (e.g., trade sites) and Slam Brands personnel made trips to China to assess certain factories. For those companies with whom Slam Brands contemplated working, Slam Brands established relationships with vendors, worked with them in product development and, if that process panned out, ordered product from those vendors.  (*Id.* ¶ 5.)

6.  Slam Brands was an exclusively wholesale business.  It opened its administrative office and showroom in Kirkland in February 2003.  (*Id.* ¶ 6.)

7.     Slam Brands' products were designed and engineered from the ground up. Slam Brands provided product specifications to the factory for the product at issue via engineering CAD files.  (*Id.* ¶ 7.)

8.     In or about September 2005, Slam Brands entered into a Factoring Agreement with Wells Fargo Century, Inc. (later known as Wells Fargo Trade Capital Services, Inc.; herein, "Wells Fargo").  A factoring agreement is a type of financing agreement:  Slam Brands assigned and sold, and Wells Fargo purchased, Slam Brands' existing and future receivables.  (*Id.* ¶ 8.)

9.     Wells Fargo would provide Slam Brands financing based, in part, on a percentage of the receivables to be collected, which financing enabled Slam Brands to fund its ongoing business activities.  (*Id.* ¶ 9.)

10.     Wells Fargo conducted the actual collections of accounts receivables from Slam Brands' retail customers.  Wells Fargo received checks directly from the retailers who purchased Slam Brands products, and applied those amounts to Slam Brands' receivables and the monies that had been advanced to Slam Brands.  (*Id.* ¶ 10.)

11.     As Slam Brands grew from six to 40 employees, it relocated to a larger office space in Redmond, Washington.  By 2007, Slam Brands had established a Chinese representative office in the city of Dongguan for sourcing vendors, product development, and quality assurance.  (*Id.* ¶ 11.)

12.     Eventually, Slam Brands employed over 60 people, outsourced five domestic warehouses, and distributed product to more than 15,000 retail locations.  (*Id.* ¶ 12.)

13.     By 2010, Slam Brands' total annual revenues had grown from over $2 million in 2003 to over $39 million.  (*Id.* ¶ 13.)

### The Parties' Agreement

14.     Mr. Lemelson was introduced to Superwood in 2008.  (*Id.* ¶ 14.)

15.     On September 1, 2009, Superwood and Slam Brands entered into a master purchasing agreement (the "MPA") whereby Superwood agreed to manufacture furniture for Slam Brands according to certain terms and specifications.  (*Id.* ¶ 15.)

16.     In paragraph 3 of the MPA, Superwood agreed that "all merchandise must be tendered to the CY within the Tender Not Before (TNB) / Tender Not After (TNA) dates listed on the Purchase Order[,]" and that "[f]ailure to tender to the CY within the TNB/TNA window as verified by the Forwarders Cargo Receipt (FCR) constitutes a late shipment."  (*Id.* ¶ 16.)

17.     Upon Superwood's providing products to the freight carrier for shipping, the freight carrier issued the FCR certifying receipt of the goods.  The date of actual shipment is found on the FCR.  (*Id.* ¶ 17.)

18.     Late shipments are identified by comparing the TNA date on Slam Brands' purchase order with the actual shipment date on the corresponding FCR.  (*Id.* ¶ 18.)

19.     Also in paragraph 3 of the MPA, Superwood agreed that "[l]ate shipments will be assessed a late shipment penalty" comprised of:  "1.0 % of the Purchase Order cost per day (to a maximum of 10 %), plus all additional transportation costs or expenses incurred by Slam Brands in order to deliver the product to the Customer on time."  (*Id.* ¶ 19.)

20.     At Slam Brands' request and prior to production, Costco put Superwood through its inspection and audit process to confirm Superwood as a Costco-approved factory to whom Slam Brands may issue purchase orders for Costco product.  (*Id.* ¶ 20.)

21.     During the entirety of the business relationship between Slam Brands and Superwood, all product that Superwood produced for Slam Brands was for Costco.  (*Id.* ¶ 21.)

22.     Slam Brands' primary contact at Superwood was a woman named Happy Shi.  (*Id.* ¶ 22.)

23.     In late 2009 and through mid-2010, pursuant to the MPA, Slam Brands contracted with Superwood to produce two national rollouts of furniture for Costco:  (a) the Rylander Desk and the Rylander File Cabinet, and (b) the Ashlyn TV console.  These were sequential rollouts.  (*Id.* ¶ 23.)

24.     Slam Brands submitted and Superwood paid a returns chargeback totaling $37,000.00 for the Rylander items returned in excess of the 2% returns allowance.  (*Id.* ¶ 24.)

### **Production of the Products**

25.     In late 2009 or early 2010, Slam Brands began working with Superwood to develop product specifications and "preproduction samples" for new lines of furniture known as the Pomeroy TV stand, the DeVore desk, the DeVore bookcase, and the DeVore file cabinet (collectively, the "Products").  The Pomeroy TV stand was developed first and the DeVore products (the "DeVore collection") were developed thereafter.  (*Id.* ¶ 25.)

26.     Slam Brands engaged Superwood in its preproduction process for each of the Products.  Superwood eventually produced a "final" preproduction sample for each of the Products that represented the specifications provided by Slam Brands and also embodied other material aspects of production quality.  (*Id.* ¶ 26.)

27.     Slam Brands presented those preproduction samples to Costco in an effort to secure Costco's placement of test orders for the Products and, ultimately, secure Costco's commitment to purchase the items from Slam Brands.  (*Id.* ¶ 27.)

28.     Beginning in or about February or March 2010, Costco placed test orders with Slam Brands for 162 (or two truckloads) of the Pomeroys.  Costco placed test orders with Slam Brands for the DeVore desk, bookcase, and file cabinet, and tested those products in the Summer of 2010.  Costco eventually awarded Slam Brands each of those items for a national rollout.  (*Id.* ¶ 28.)

29.     The Pomeroy was scheduled to be sold in Costco's U.S. stores for a six-month period, beginning in November 2010 and through April 2011.  (*Id.* ¶ 29.)

30.     The DeVore collection was scheduled to be sold in Costco's U.S. stores for a six-week period beginning in late December 2010.  (*Id.* ¶ 30.)

31.     The products that Superwood produced for Costco's test orders represented the quality level initially agreed upon between Slam Brands and Superwood for the Products.  (*Id.* ¶ 31.)

32.     Thereafter, Slam Brands worked with Superwood through a second preproduction process and the parties agreed to certain changes to the prior specifications represented by the test orders.  (*Id.* ¶ 32.)

33. Slam Brands and Superwood worked closely to develop product specifications, production samples, and color swatches for the Products in advance of mass production. (*Id.* ¶ 33.)

34. There were several rounds of production samples of the Products made by Superwood. (*Id.* ¶ 34.)

35. The use of production samples and color swatches represents industry standard practice for establishing (i) what materials will be used, (ii) what finishes will be used, (iii) the appearance of acceptable finishes, (iv) acceptable production methods, and (v) overall quality. (*Id.* ¶ 35.)

36. Color panels (or swatches) are used in the furniture industry to ensure consistent finishing across the entire production run and across multiple autonomous finishing lines. (*Id.* ¶ 36.)

37. Slam Brands and Superwood agreed on all material aspects of production quality of the Pomeroy and DeVore Products, including (i) the final specifications of the Products, (ii) the final production samples, and (iii) the final color swatches. (*Id.* ¶ 37.)

38. The product specifications provided by Slam Brands to Superwood for the Products identified dimensions, materials, finishes, hardware and other quality attributes of the Products. (*Id.* ¶ 38.)

39. Final production samples and color swatches related to production of the Products were signed by representatives of Slam Brands. (*Id.* ¶ 39.)

40. The final production samples and color swatches were kept in the Superwood factory as a reference for mass production of the Products. (*Id.* ¶ 40.)

41.     Slam Brands provided Superwood detailed package specifications for the Products, which included (i) overall dimensions, (ii) corrugate types and thicknesses, (iii) color labels, and (iv) carton markings.  (*Id.* ¶ 41.)

42.     Slam Brands provided Superwood with approved packaging and carton exemplars for shipment of the Products to be kept at Superwood's factory for reference both before and during mass production.  (*Id.* ¶ 42.)

43.     After Costco issued its mass production orders to Slam Brands, in or about August 2010 Slam Brands began issuing mass production purchase orders for Pomeroy TV stands to Superwood.  Slam Brands similarly began issuing mass production purchase orders for the DeVore products beginning in or about mid-September 2010.  (*Id.* ¶ 43.)

44.     Superwood did not retain a security interest or title to the furniture after shipment.  (*Id.* ¶ 44.)

45.     During mass production of the Products, Slam Brands staff, including Mr. Lemelson, engaged Superwood in person and via emails and conference calls to discuss quality problems being noted and the specification standards.  (*Id.* ¶ 45.)

46.     On January 5, 2011, Slam Brands cancelled eight purchase orders issued to Superwood for a total of 1,044 Pomeroys.  (*Id.* ¶ 46.)

47.     Also on January 5, 2011, Slam Brands paid Superwood $594,335.40.  (*Id.* ¶ 47.)

48.     On January 11, 2011, Slam Brands paid Superwood $669,954.00.  (*Id.* ¶ 48.)

//

ORDER- 8

**Costco's Return Process**

49.     Upon a Costco member's return of an item to a store, the store issued a unique "Return to Vendor" or "RTV" number and requested from Slam Brands a corresponding (and also unique) "Return Authorization" or "RMA" or "RA" number for the item or items returned.  (*Id.* ¶ 49.)

**Quantities Sold to Costco: Superwood Unpaid Invoices**

50.     Between October 2010 through April 2011, Slam Brands issued invoices to Costco for Pomeroy and DeVore collection inventory totaling $11,614,765.25.  (*Id.* ¶ 50.)

51.     Slam Brands admits that it did not pay the invoices listed on Superwood's Trial Exhibit No. 3 and does not dispute the total amount claimed due is $2,654,388.00.  (*Id.* ¶ 51.)

**The Slam Brands Asset Sale**

52.     On or about November 17, 2010, Whalen Furniture Manufacturing, Inc. ("Whalen") made a proposal by Letter of Intent ("LOI") to acquire the Slam Brands business.  (*Id.* ¶ 52.)

53.     On or about December 13, 2010, Whalen made a second proposal by LOI to acquire the Slam Brands business, which Slam Brands accepted.  (*Id.* ¶ 53.)

54.     In December 2010, following further discussions between Slam Brands and Whalen, Slam Brands agreed to sell certain of its assets to Whalen for $5.5 million.  Slam Brands did not discuss with Superwood the potential of a sale or acquisition of all or part of Slam Brands.  (*Id.* ¶ 54.)

55.     Slam Brands and Whalen entered into a written Asset Purchase Agreement, dated as of February 28, 2011 (the "APA").  (*Id.* ¶ 55.)

56.     The Employment Agreement between Whalen and Mr. Lemelson, which is Exhibit C to the APA, is dated and effective as of March 1, 2011.  Pursuant to the Employment Agreement, Mr. Lemelson received a gross salary of $10,000.00 on a bi-weekly basis.  Mr. Lemelson's employment with Whalen terminated as of September 30, 2011.  (*Id.* ¶ 56.)

57.     Pursuant to the APA, on or about March 4, 2011, Whalen paid Wells Fargo approximately $3,437,244.00.  Whalen also paid Slam Brands $962,756.00.  (*Id.* ¶ 57.)

58.     Subsequent to the closing of the of the Slam Brands-Whalen transaction, Slam Brands continued to operate with a reduced staff.  (*Id.* ¶ 58.)

59.     Today, Slam Brands remains an active company as licensed by the Washington Secretary of State, but it is no longer engaged in its former business operations.  At the present date, Slam Brands does not possess sufficient assets to pay the amount Superwood claims as due (without accounting for Slam Brands' contractual offsets, counterclaims, and asserted damages).  (*Id.* ¶ 59.)

60.     In early 2012, Slam Brands received $994,185.73 of the $1,100,000.00 balance due from Whalen.  (*Id.* ¶ 60.)

**B.     Credibility Determinations**

61.     The court found all of the witnesses who testified at trial to be equally credible and uncredible.  The court heard testimony from Jason Lemelson, Jian "Happy" Shi, and Anna Marietta.  All three of these witnesses were forthright in their testimony,

1  although the testimony of both Mr. Lemelson and Ms. Shi was at times self-interested.

2  Further, all three witnesses were knowledgeable and provided testimony that was helpful

3  to the court.  Generally, they all answered questions candidly on both direct and cross

4  examination, and the court found parts of their testimony to be credible.

5          62.     There was a substantial amount of evidence that would have been helpful to

6  the court that was not presented.  The court would have benefitted from hearing

7  testimony by Costco personnel, by a damages expert, and most importantly by Mr.

8  Whalen or someone else at the Whalen company.  Instead, the court heard testimony

9  from only three witnesses, none of whom were entirely disinterested.  The missing

10  evidence was critical to Slam Brands' damages case, and its absence was significant to

11  the parties' respective burdens of proof.

12  **C.     Facts Proved at Trial**

13          63.     Costco was Slam Brands' first customer in 2002.  (9/23/13 Tr. (Lemelson

14  Testimony) at 60.)  From 2003 until March of 2011, Slam Brands sold its products in

15  Costco stores continuously.  (*Id.* at 68-69.)  Costco products provided a steady income

16  stream for Slam Brands and became an important driver of Slam Brands' growth.  (*Id.* at

17  68.)  In 2003, sales to Costco accounted for 100 % of Slam Brands' revenue.  (*Id.* at 71-

18  72.)  That figure dropped in subsequent years, but it never dropped below 50 %.  (*Id.*)

19          64.     In addition to furniture, Slam Brands had a product line consisting of

20  storage accessories for console gaming.  (*Id.* at 77-78.)  For example, Slam Brands

21  produced gaming towers, storage compartments, and similar accessories.  (*Id.*)  Slam

22

1   Brands started this product line, called "Level Up," in 2008 and began to experience

2   significant revenue from this line in 2009 and 2010.  (*Id.* at 78, 92-93.)

3       65.    Prior to signing the MPA, Superwood representatives told Slam Brands that

4   Superwood was capable of producing furniture on time and at quality levels that would

5   be acceptable to Costco.  (9/24/13 Tr. (Shi Testimony) at 20-21.)

6       66.    In 2010, Superwood had an office and manufacturing facility in Guangdong

7   province, China.  (*Id.* at 15-16.)  Superwood's manufacturing space was roughly 70,000

8   square meters, and Superwood had between 1,000 and 2,000 employees.  (*Id.* at 15-17.)

9       67.    Slam Brands had between three and five quality control personnel at the

10  Superwood factory during the time period when the Pomeroy and DeVore products were

11  being produced.  (*Id.* at 54-55; 9/27/13 Tr. (Lemelson Testimony) at 3.)  These inspectors

12  inspected finished products, but did not inspect every product that Superwood produced.

13  (9/27/13 Tr. (Lemelson Testimony) at 6; 9/25/13 Tr. (Marietta Testimony) at 81-83.)

14      68.    Mr. Lemelson never promised to personally pay Superwood if Slam Brands

15  did not.  (9/24/13 Tr. (Shi Testimony) at 22-23.)

16              **<u>Quality Problems with the DeVore and Pomeroy Products</u>**

17      69.    Throughout the manufacturing process for the DeVore and Pomeroy

18  products, Slam Brands experienced significant problems with Superwood.  (*See, e.g.*,

19  Exs. A-22, A-24, A-33, A-34; 9/24/13 Tr. (Shi Testimony) at 43-44, 48-50, 52-53, 58-

20  60.)  Superwood was not producing products according to specification, and there was a

21  substantial amount of negotiation and discussion between the parties regarding this fact.

22

1   (*See, e.g.*, Exs. A-22, A-24, A-33, A-34; 9/24/13 Tr. (Shi Testimony) at 43-44, 48-50, 52-

2   53, 58-60.)

3       70.     Slam Brands suspected that it would have quality problems with the

4   Pomeroy and DeVore products well before those problems actually materialized in

5   Costco stores.  (*See, e.g.*, 9/25/13 Tr. (Marietta Testimony) at 24-27; 9/27/13 Tr.

6   (Lemelson Testimony) at 39.)

7       71.     There were quality problems with some of the Pomeroy and DeVore

8   products that resulted from poor manufacturing by Superwood.  (*See, e.g.*, 9/23/13 Tr.

9   (Lemelson Testimony) at 94, 101; Ex. A-55.)

10      72.     Those problems materialized in December 2010 and January 2011.

11  (9/23/13 Tr. (Lemelson Testimony) at 94-96.)  During this timeframe, Slam Brands

12  received numerous complaints from Costco and from Costco customers indicating that

13  the quality level of the Pomeroy and DeVore products was not acceptable.  (*Id.*)  It

14  quickly became evident that there were serious quality problems with these products.

15  (*Id.*)

16      73.     In late December 2010, Mr. Lemelson was summoned to a meeting with a

17  Costco buyer and a Costco vice president to discuss quality problems with the DeVore

18  product line.  (*Id.* at 107-10.)  At this point, Costco had already begun complaining to

19  Slam Brands that the DeVore products had a quality problem.  (*Id.*)

20          a.     Before the meeting, Mr. Lemelson was instructed to purchase three

21  DeVore desks from Costco stores and bring them to Costco headquarters in Issaquah.

22  (*Id.* at 107-08.)  When he arrived at the meeting, he was instructed to open the DeVore

1 items with the understanding that, if the products were defective or had major quality

2 problems, Costco would "do a recall on the product." (*Id.* at 109.)

3          b.      In a recall, Costco declares the recalled product unsalable, cancels

4 all orders for the product, and requires the vendor to pick up the product from Costco

5 stores at the vendor's expense. (*Id.* at 110.) A recall would have had a devastating

6 impact on Slam Brands as a going concern and may have rendered the company insolvent

7 almost immediately. (9/25/13 Tr. (Lemelson Testimony) at 126-28.)

8          c.      Mr. Lemelson opened the three DeVore items he purchased.

9 (9/23/13 Tr. (Lemelson Testimony) at 109-10.) There were some quality issues with the

10 products, but they were not major enough for Costco to order a recall of the product.

11 (*Id.*) Mr. Lemelson testified that he felt like he "dodged a bullet." (*Id.*)

12     74.     In January, Mr. Lemelson had a similar meeting with respect to the

13 Pomeroy. (9/25/13 Tr. (Lemelson Testimony) at 151-52; 9/26/13 Tr. (Lemelson

14 Testimony) at 21-24.) He and several Costco executives opened between 14 and 20

15 Pomeroy units at the Issaquah Costco store with the understanding that any defective

16 units found would likely result in a recall. (9/25/13 Tr. (Lemelson Testimony) at 151-52;

17 9/26/13 Tr. (Lemelson Testimony) at 21-24.) There were no defective units found at the

18 meeting, and Mr. Lemelson felt like he "dodged a bullet" once again. (9/25/13 Tr.

19 (Lemelson Testimony) at 152.)

20     75.     Throughout December and January, it became clear that many of the

21 Pomeroy and DeVore products produced by Superwood had quality problems and did not

22 conform to the agreed-upon quality level, to Slam Brands' specifications, or to the

ORDER- 14

1    preproduction samples.  (*See, e.g.*, 9/25/13 Tr. (Marietta Testimony) at 60-78.)

2    Specifically:

3            a.      Some of the DeVore products had drawer fronts that would split

4    from the drawer when pulled open.  (Exs. A-60, A-62.)

5            b.      Some of the DeVore products had glue and water marks on the

6    finish and incomplete finishing.  (*Id.*)

7            c.      Some of the Pomeroy products had finishing problems.  (*See* Ex. A-

8    57.)  Some Pomeroy products had incomplete or bad finishing.  (*Id.*)  On others, the

9    finishing was too thick or too thin.  (*Id.*)  At times, the finishing was inconsistent or

10   uneven throughout a single product.  (*Id.*)  In places, the finishing had "orangy kind of

11   spots, along with dark spots, instead of a consistent overall finish."  (9/25/13 Tr.

12   (Marietta Testimony) at 62.)

13           d.      Some of the Pomeroy products were damaged, gashed, scratched, or

14   cracked.  (*Id.*)

15           e.      Some of the Pomeroy products had visible glue, "finishing clouds,"

16   visible drip marks, textured finish, or missing basecoat.  (*See id.*)

17           f.      Some of the Pomeroy products showed signs of "telegraphing" wood

18   that resulted from manufacturing processes that were contrary to the specifications

19   provided by Slam Brands to Superwood.  (*See, e.g.*, Exs. A-68, A-71, A-72, A-75;

20   9/25/13 Tr. (Marietta Testimony) at 70-71.)  This caused those products to have

21   significant quality problems, including nail heads appearing to "stick out" on the top

22

1    surface of the products.  (*Id.*)  Such products were not acceptable to Costco and were

2    below the agreed-upon quality level.  (*Id.*; 9/23/13 Tr. (Lemelson Testimony) at 101.)

3              g.      Some of the Pomeroy products had visible marks where putty was

4    used at the factory to fix a flaw in the wood.  (*See, e.g.*, Ex. A-87.)

5              h.      Costco customers identified many additional quality problems with

6    the DeVore and Pomeroy products as well and returned the product to Costco.  (*See* Ex.

7    A-120.)

8              f.      Often, the problems with the Pomeroy were visible to the naked eye

9    and would be apparent to a potential customer.  (*See, e.g.*, Ex. A-57.)

10             g.      Many of the quality problems would have been difficult for Slam

11   Brands quality control personnel to detect at the factory but could have been prevented if

12   Superwood had adhered to Slam Brands' specifications during production.  (*See, e.g.*,

13   9/25/13 Tr. (Marietta Testimony) at 50-51, 71-73.)

14             h.      The problems with the Pomeroy and DeVore products did not result

15   from improper handling of the items during shipping.  (*See, e.g.*, 9/25/13 Tr. (Marietta

16   Testimony) at 68, 71-73; Ex. A-86.)

17                      **Slam Brands' Failure to Pay Superwood**

18             76.     During the December 2010 to January 2011 timeframe, Slam Brands

19   ceased making payments that were at that time due to Superwood for the Pomeroy and

20   DeVore products.  (9/23/13 Tr. (Lemelson Testimony) at 29, 45, 50-51; Exs. 1-3.)  Slam

21   Brands completed several payments to Superwood for these products, but never paid the

22   entire amount due because Mr. Lemelson believed Superwood owed Slam Brands more

1  money than Slam Brands owed Superwood on account of the Pomeroy and DeVore

2  quality problems.  (9/24/13 Tr. (Shi Testimony) at 11; 9/23/13 Tr. (Lemelson Testimony)

3  at 29, 45, 50-51; Exs. 1-3.)

4      77.     Slam Brands failed to pay $2,654,388.00 of the charges properly invoiced

5  to it by Superwood for the Pomeroy and DeVore products.  (9/24/13 Tr. (Shi Testimony)

6  at 11; 9/23/13 Tr. (Lemelson Testimony) at 29, 50-51; Exs. 1-3.)

7      78.     Mr. Lemelson received distributions from Slam Brands of $1,421,290.54 in

8  2010 and $3,519,866.39 in 2011.  (9/23/13 Tr. (Lemelson Testimony) at 46-49; Exs. 7,

9  8.)  Between 2007 and 2011, Mr. Lemelson received a total of $8,300,505.81 in

10  distributions from Slam Brands.  (Exs. 7, 8.)

11      79.     Slam Brands would have had sufficient funds to pay Superwood had Mr.

12  Lemelson not taken distributions from Slam Brands in 2011.  (9/23/13 Tr. (Lemelson

13  Testimony) at 51-52.)  Mr. Lemelson testified that the he is "positive" that money "could

14  have been made available" to pay Superwood but was not made available "because [Mr.

15  Lemelson] took distributions."  *Id.*  Slam Brands refused to pay Superwood because Mr.

16  Lemelson believed Slam Brands did not owe Superwood anything.  (*Id.* at 29, 45, 50-52.)

17      80.     In early 2012, Slam Brands received a $994,185.73 payment from Whalen.

18  (Pretrial Order ¶ 60.)  Slam Brands did not pay that money to Superwood, but instead

19  loaned it to Mr. Lemelson.  (9/23/13 Tr. (Lemelson Testimony) at 45.)

20      81.     The only assets Slam Brands currently has are:  (1) a $100,000.000

21  receivable representing a payment due from Whalen Furniture; (2) a $995,000.00

22  receivable representing a loan to Mr. Lemelson; and (3) a contingent asset representing

1  Slam Brands' interest in a lawsuit currently pending against Wells Fargo Trade Capital.

2  (*Id.* at 4.)

3  **The Aftermath**

4      82.    There is no evidence in the record suggesting that Costco ever did a recall

5  for any of the Pomeroy or DeVore products.  (*See, e.g.*, 9/27/13 Tr. (Lemelson

6  Testimony) at 33-35.)

7      83.    At Costco's request, Slam Brands cancelled purchase orders for 2,000

8  DeVore desks.  (Ex. A-74.)

9      84.    At Costco's request, Costco and Slam Brands personnel inspected all

10  Pomeroy inventory in stores and warehouses in mid-January and pulled all defective

11  units.  (Exs. A-75, A-80.)

12      85.    On January 20, 2011, Mr. Lemelson reported to Costco that his inspectors

13  had turned up "next to nothing" in the way of quality issues, stating that "I think the bad

14  batch is concentrated."  (Ex. A-85.)  Mr. Lemelson described the Pomeroy problems as

15  "very isolated," and cited a product return rate of 3.3 %.  (Ex. 23.)

16      86.    Costco incurred $10,425.00 in inspection costs related to the Pomeroy and

17  DeVore products and charged those costs to Slam Brands.  (Ex. A-88.)

18      87.    Slam Brands incurred inspection costs in its warehouses, and proved these

19  expenses in the amount of $32,676.08.  (Ex. A-89; 9/25/13 Tr. (Lemelson Testimony) at

20  174-75.)  After the inspection, Slam Brands disposed of inventory that had quality

21  problems, and Slam Brands proved that the cost of this inventory was $14,946.00.  (Ex.

22  A-98; 9/25/13 Tr. (Lemelson Testimony) at 184-85.)

88.   Costco marked down the price of many DeVore and Pomeroy products. (Exs. A-90, A-91, A-92, A-97, A-101.)  These markdowns were due to quality problems, and were caused by Superwood producing products below the agreed-upon quality level. (*See, e.g.*, 9/25/13 Tr. (Lemelson Testimony) at 179-83.)  Slam Brands proved these markdowns in the amount of $44,796.56 for the DeVore filing cabinet (Ex. A-90), $13,054.74 for the DeVore bookcase (Ex. A-91), $9,218.64 for the DeVore desk (Ex. A-92), and $406,452.48 for the Pomeroy (Exs. A-97, A-101) for a total of $473,522.42.

89.   Costco continued to sell the Pomeroy through April 2011.  (9/27/13 Tr. (Lemelson Testimony) at 33-35.)  The Pomeroy generated revenue for Slam Brands during that time.  (*Id.*)  All Pomeroy units were eventually sold, and less than 2000 were returned out of a total of roughly 26,000 initially ordered.  (*Id.* at 73.)

## Circumstances Surrounding the APA

90.   Defendants' consequential damages theory is predicated on a comparison between Whalen's initial offer to purchase Slam Brands and the APA that Slam Brands and Whalen eventually signed.  (*See* Slam Brands Tr. Br. (Dkt. # 103) at 15-16.)

91.   Whalen and Slam Brands were direct competitors in the furniture industry, and in particular, they regularly competed to have their products sold at Costco.  (9/23/13 Tr. (Lemelson Testimony) at 80-82.)  Whalen was roughly ten times the size of Slam Brands.  (*Id.* at 84.)

92.   Whalen's initial LOI to purchase Slam Brands contemplated a stock sale with a purchase price of $11.9 million in addition to a three-year "earnout" equal to 3 % of net sales.  (*Id.* at 36-38, 91-92; Ex. 14.)

93.     Mr. Lemelson met with Mr. Whalen on the same day as his first recall meeting with Costco in December 2010 regarding DeVore products (*see* Finding of Fact No. 73).  (9/25/13 Tr. (Lemelson Testimony) at 131-33.)  Mr. Whalen knew about Mr. Lemelson's meeting with Costco and its purpose.  (*Id.*)  Mr. Lemelson described to Mr. Whalen the challenges he was facing with Costco at that time.  (*Id.*)  In response, Mr. Whalen made a revised offer of $5.5 million to purchase Slam Brands "no questions asked," i.e., without the 75-day due diligence period contemplated in earlier discussions between the two men.  (*Id.*)  Mr. Lemelson did not accept the offer right away, but this proposal ultimately formed the basis of the APA.  (*See* Ex. 5.)  Mr. Lemelson accepted the offer in late December.  (9/23/13 Tr. (Lemelson Testimony) at 39.)

94.     At the time Mr. Lemelson accepted Mr. Whalen's offer to purchase Slam Brands, Mr. Lemelson was afraid of a Pomeroy or DeVore recall, worried about markdowns in the gaming division unrelated to Superwood, and concerned that he would walk away from Slam Brands with nothing.  (9/25/13 Tr. (Lemelson Testimony) at 136-38; 9/23/13 Tr. (Lemelson Testimony) at 39.)  He believed there was a "firestorm coming."  (9/25/13 Tr. (Lemelson Testimony) at 138.)  Mr. Lemelson felt there was very little possibility that things would turn out well for Slam Brands given the challenges it faced.  (*Id.*)

95.     At the time the APA was signed, Slam Brands was facing significant challenges in its gaming division.  (Ex. A-58; 9/25/13 Tr. (Lemelson Testimony) at 120-21; 9/27/13 (Lemelson Testimony) at 53-55.)  Slam Brands was facing a "sales issue" and was anticipating significant markdowns of its inventory.  (Ex. A-58; 9/27/13

1  (Lemelson Testimony) at 53-55.)  Mr. Lemelson referred to this at one point as the "2010

2  gaming implosion." (Ex. 15.)  This situation threatened Slam Brands' financing

3  arrangement with Wells Fargo.  (9/27/13 (Lemelson Testimony) at 53-55.)

4      96.    Mr. Lemelson signed a five-year non-compete agreement as part of the

5  APA.  (*See* Ex. A-95.)

6      97.    The LOI and the APA are vastly different in form and structure.  (*Compare*

7  Ex. 14 *with* Ex. 6.)  The LOI contemplated a stock sale, whereas the APA contemplated

8  an asset sale.  (*See id.*; 9/27/13 Tr. (Lemelson Testimony) at 12-15.)  These are different

9  transactions with very different implications for the buyer and seller alike.  (9/27/13 Tr.

10  (Lemelson Testimony) at 12-15.)  The LOI included a 75-day due diligence period,

11  whereas the APA was a "no questions asked" deal.  (*Id.* at 19; 9/25/13 Tr. (Lemelson

12  Testimony) at 131-33.)  The LOI had working capital requirements, whereas the APA did

13  not.  (9/27/13 Tr. (Lemelson Testimony) at 19-22; Exs 6, 14.)  The LOI required Slam

14  Brands to meet an EBITDA target of $3.2 million for 2010, whereas the APA did not,

15  and in reality Slam Brands fell nearly $1 million short of meeting this target.  (Exs. 6, 14;

16  9/27/13 Tr. (Lemelson Testimony) at 23-25.)  The LOI involved all Slam Brands assets,

17  whereas the APA excluded certain assets, many of which generated substantial revenue

18  for Slam Brands and Mr. Lemelson.  (*Compare* Ex. 14 *with* Ex. 6.)  The LOI and APA

19  had different tax implications for both the buyer and the seller, including a potential $4.2

20  million tax benefit for Whalen in the LOI.  (9/27/13 Tr. (Lemelson Testimony) at 12-15,

21  49.)

22

## II.   CONCLUSIONS OF LAW

1.    The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of parties and the amount in controversy exceeds $75,000.00.

2.    Washington law governs.

3.    Washington's version of the Uniform Commercial Code ("UCC") applies because this case involves a contract for the sale of goods.  *See* RCW 62A.2-102, 105. Under the UCC, the buyer, in this case Slam Brands, can accept nonconforming goods and still pursue contract remedies against the seller for non-conformity.  RCW 62A.2-607(2) (Acceptance of goods does not "impair any other remedy provided by this Article for non-conformity.").  Here, there is no dispute that Slam Brands accepted all goods tendered by Superwood.  *See* RCW 62A.2-606 (defining "acceptance of goods"). Nevertheless, Slam Brands is not precluded from pursuing remedies against Superwood for the tender of non-conforming goods.  RCW 62A.2-607(2).

4.    All notice requirements under the UCC have been met.  *See* RCW 62A.2-607(3); (*see, e.g.*, Ex. A-62; 9/24/13 Tr. (Shi Testimony) at 66-68.)

### **Superwood's Claims**

5.    <u>Breach of Contract.</u>  Slam Brands breached its contract with Superwood by failing to pay $2,654,388.00 that it owed for the Pomeroy and DeVore products:

   a.    Under the UCC, if a buyer fails to pay the price of goods as that price becomes due, the seller can recover the price of any goods accepted.  RCW 62A.2-709.

1      b.      Slam Brands owed $2,654,388.00 to Superwood under the MPA and

2  associated purchase orders for Pomeroy and DeVore products that Slam Brands accepted.

3  (*See* Exs. 1, 3.)

4      c.      Slam Brands did not pay this amount.  (9/24/13 Tr. (Shi Testimony)

5  at 11; 9/23/13 Tr. (Lemelson Testimony) at 29, 50-51; Exs. 1-3.)

6      d.      Slam Brands' failure to pay caused damages to Superwood in the

7  amount of $2,654.388.00, and all of these damages were reasonably foreseeable.  *See*

8  *Gaglidari v. Denny's Restaurants, Inc.*, 815 P.2d 1362, 1373 (Wash. 1991) (citing

9  *Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng. Rep. 145, 151 (1854)).

10      e.      Superwood claims an additional $12,712.11 in damages as a result

11  of miscellaneous charges it claims were authorized by Superwood, including freight

12  charges, "touch pen" charges, and "rework" fees.  (*See* Ex. 3.)  Superwood did not prove

13  that these costs were authorized by Slam Brands or that Slam Brands ever agreed to pay

14  them.  (*See* 9/24/13 Tr. (Shi Testimony) at 13-14.)  Thus, Superwood did not prove that

15  these expenses are properly included as damages.

16      6.      <u>Corporate Disregard.</u>  Mr. Lemelson is personally liable for Superwood's

17  claims against Slam Brands:

18      a.      Under Washington law, the corporate form may be disregarded in

19  limited circumstances.  Ordinarily, the shareholders of a corporation are not liable for

20  debts incurred by the corporation.  *Meisel v. M&N Modern Hydraulic Press Co.*, 645

21  P.2d 689, 693 (Wash. 1982) ("The purpose of a corporation is to limit liability.").

22  However, a shareholder must answer for a corporate liability if the "corporate veil" is

1   "pierced" upon a showing that either (1) the corporation has been intentionally used to

2   violate or evade a duty owed to another and disregard is necessary and required to

3   prevent unjust loss to the injured party; or (2) the corporate entity has been disregarded

4   by the principals themselves so that there is such a unity of ownership and interest that

5   the separateness of the corporation has ceased to exist.  *Id.* at 692; *Grayson v. Nordic*

6   *Const. Co., Inc.*, 599 P.2d 1271, 1273-74 (Wash. 1979); *Plese-Graham, LLC v.*

7   *Loshbaugh*, 269 P.3d 1038, 1047-48 (Wash. Ct. App. 2011).

8           b.      Here, there is no evidence that the corporate form may be

9   disregarded pursuant to *Meisel* prong (2) above.

10          c.      However, the court concludes that the facts of this case justify

11  disregarding the corporate form pursuant to *Meisel* prong (1).

12          d.      The Slam Brands corporate form was intentionally used by Mr.

13  Lemelson to evade a duty owed to Superwood.  (*See, e.g.*, 9/23/13 Tr. (Lemelson

14  Testimony) at 4, 29, 45, 46-52; 9/24/13 Tr. (Shi Testimony) at 11; Exs. 1-3, 7-8; Pretrial

15  Order ¶ 60.)  Mr. Lemelson took money out of Slam Brands intending to prevent

16  Superwood from being paid.  (*See, e.g.*, 9/23/13 Tr. (Lemelson Testimony) at 46-49, 51-

17  52; Exs. 7, 8.)  It was Mr. Lemelson's stated belief that Superwood owed Slam Brands

18  more money than Slam Brands owed Superwood, but the court rejects this stated belief as

19  a basis for avoiding corporate disregard.  (*See* 9/24/13 Tr. (Shi Testimony) at 11; 9/23/13

20  Tr. (Lemelson Testimony) at 29, 45, 50-51; Exs. 1-3.)  Mr. Lemelson's belief that he

21  would ultimately be successful in this lawsuit does not justify him in withholding

22  payments due to Superwood.  The court has now determined that Slam Brands does in

1  fact owe Superwood money, and did all along.  (*See* Conclusions of Law No. 5.)  Mr.

2  Lemelson's stated belief also was not supported by facts:  Slam Brands has produced no

3  evidence that it had a judgment against Superwood, any other legal right to collect

4  against Superwood, or any legally supportable reason not to pay Superwood.  To the

5  contrary, Slam Brands had a duty to pay Superwood, and Mr. Lemelson intentionally

6  removed assets from Slam Brands in order to evade that duty.  Mr. Lemelson took

7  distributions and loaned money to himself instead of paying Slam Brands' outstanding

8  debt.  (9/23/13 Tr. (Lemelson Testimony) at 46-49, 51-52; Exs. 7, 8.)

9            e.      Disregard is necessary and required to prevent unjust loss to

10  Superwood.  Slam Brands owes money to Superwood, as determined herein.  Slam

11  Brands currently does not have sufficient assets to pay Superwood, and there are no

12  assets scheduled to accrue in the foreseeable future.  (9/23/13 Tr. (Lemelson Testimony)

13  at 4.)  Superwood will remain unpaid if the corporate form is not disregarded.  This will

14  result in an unjust loss to Superwood.  Superwood performed work for Slam Brands, and

15  should be paid for that work minus applicable contractual offsets and damages caused by

16  non-conforming products.  This case would have an unfair and unjust outcome in the

17  absence of corporate disregard.  *See Meisel*, 645 P.2d at 692; *Grayson*, 599 P.2d at 1273-

18  74.

19            f.      It is fair and just to hold Mr. Lemelson personally liable for the

20  amount presently owed to Superwood.  The amount owed to Superwood is exceeded by

21  the amount Mr. Lemelson took in distributions and loans after the debt to Superwood had

22  already been incurred.  Thus, the net effect of holding Mr. Lemelson liable will be the

1   same as if Mr. Lemelson had left the money in Slam Brands in the first place, litigated

2   this case to determine Slam Brands' liabilities, then paid Superwood accordingly.  This is

3   a fair and just outcome that justifies corporate disregard.

4          g.       The court concludes that Mr. Lemelson is personally liable for

5   Superwood's claims against Slam Brands.  *See Meisel*, 645 P.2d at 692; *Grayson*, 599

6   P.2d at 1273-74.

7          7.       <u>Uniform Fraudulent Transfer Act ("UFTA").</u>  To the extent it is necessary,

8   the court also finds that Slam Brands' transfers to Mr. Lemelson were fraudulent under

9   the UFTA:

10          a.       Under Washington's version of the UFTA, a transfer of assets may

11  be declared fraudulent and set aside if either (1) it is made "[w]ith actual intent to hinder,

12  delay, or defraud any creditor of the debtor," or (2) it is made without receiving a

13  reasonable equivalent value in exchange for the transfer.  RCW 19.40.041(a)(1)-(2).  The

14  UFTA sets forth eleven factors for a fact finder to consider in deciding whether a transfer

15  was made with actual intent to hinder, delay, or defraud a creditor, including whether:

16  (1) the transfer or obligation was to an insider; (2) the debtor retained possession or

17  control of the property transferred after the transfer; (3) the transfer or obligation was

18  disclosed or concealed; (4) before the transfer was made or the obligation incurred, the

19  debtor had been sued or threatened with suit; (5) the transfer was of substantially all of

20  the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets;

21  (8) the value of the consideration received by the debtor was reasonably equivalent to the

22  value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly

1  after the transfer was made; (10) the transfer occurred shortly before or shortly after a

2  substantial debt was incurred; and (11) the debtor transferred the essential assets of the

3  business to a lienor who transferred the assets to an insider of the debtor.  RCW

4  19.40.041(b).

5          b.      The court concludes that Mr. Lemelson had "actual intent to hinder

6  or delay" Superwood as that term is understood under RCW 19.40.041(b) when he took

7  distributions and made a loan to himself, leaving insufficient funds in Slam Brands to pay

8  Superwood.  (*See, e.g.*, 9/23/13 Tr. (Lemelson Testimony) at 4, 29, 45, 46-52; 9/24/13 Tr.

9  (Shi Testimony) at 11; Exs. 1-3, 7-8; Pretrial Order ¶ 60.)  In reaching this conclusion,

10  the court relies largely on the considerations described above with respect to corporate

11  disregard, but also specifically considers factors (1)-(5), (9), and (10) of RCW

12  19.40.041(b).

13          8.      Unjust Enrichment.  The court declines to rule on Superwood's claim for

14  unjust enrichment against Mr. Lemelson, finding that any damages awarded for this claim

15  would be duplicative of the damages awarded above.  Unjust enrichment is a "method of

16  recovery for the value of [a] benefit retained absent any contractual relationship because

17  notions of fairness and justice require it."  *Young v. Young*, 191 P.3d 1258, 1262 (Wash.

18  2008).  To establish a claim for unjust enrichment, a plaintiff must prove three elements:

19  (1) the defendant received a benefit, (2) the received benefit is at the plaintiff's expense,

20  and (3) the circumstances make it unjust for the defendant to retain the benefit without

21  payment.  *Id.*  It is not necessary to reach Superwood's unjust enrichment claim because a

22

1   favorable ruling would not provide any relief to Superwood that Superwood will not

2   already receive under these findings and conclusions.  (*See* Conclusions of Law No. 5-7.)

3   ### **Defendants' Counterclaims**

4   9.      <u>Breach of Contract and Breach of Warranty Claims.</u>  Slam Brands proved

5   its claims against Superwood for breach of contract, breach of express warranty, and

6   breach of the implied warranties of merchantability and fitness for a particular purpose.

7   The court first addresses liability for each separate cause of action then turns to causation

8   and damages.

9   a.      <u>Breach of Contract and Breach of Express Warranty</u>

10      i.      Under Washington's version of the UCC, "where a buyer has

11  accepted goods . . . he may recover as damages for any non-conformity of tender the loss

12  resulting in the ordinary course of events from the seller's breach as determined in any

13  manner which is reasonable."  RCW 62A.2-714.

14      ii.      Superwood had a duty under the MPA to produce the

15  Pomeroy and DeVore products for Slam Brands at the agreed-upon quality level

16  determined by the specifications sent to Superwood by Slam Brands and the

17  corresponding preproduction samples, as described above.  (Ex. 1 ¶ 4.)  Superwood also

18  made express warranties that it would produce the Pomeroy and DeVore products to

19  these specifications and at the agreed-upon quality level.  (*Id.*)  *See also* RCW 62A.2-313

20  (defining "express warranties").

21      iii.      Many of the Pomeroy and DeVore products produced by

22  Superwood were not made according to specification and did not meet the quality level

1  agreed upon by the parties, as explained in detail in the findings of fact above,

2  specifically finding of fact No. 74.  A sufficient number of the Pomeroy and DeVore

3  products failed to conform to the specifications and the preproduction samples such that

4  Superwood breached its contract with Slam Brands and breached express warranties it

5  made to Slam Brands both in the contract and at other times.  In particular, the express

6  warranties at issue include agreeing to produce the products according to the

7  specifications provided by Slam Brands and in a manner that conformed to the

8  preproduction samples.  (Ex. 1 ¶ 4.)

9            iv.    The court finds it unnecessary to reach the question of

10  whether Superwood breached its duty of good faith and fair dealing.  In these

11  circumstances, this claim would be duplicative of a breach of contract claim and would

12  provide no additional relief to Slam Brands.

13            b.    Breach of the Implied Warranty of Merchantibility

14            i.    To prove a claim for breach of the implied warranty of

15  merchantability under Washington law, a plaintiff must prove:  (1) the seller is a

16  merchant with respect to goods of the kind sold; (2) the goods were not merchantible

17  because either (a) they would not pass without objection in the trade under the contract

18  description; (b) they are not of fair average quality within the description; (c) they are not

19  fit for the ordinary purpose for which such goods are used; or (d) they are not of even

20  kind and quality among units, among other reasons; (3) damages proximately caused by

21  the defective nature of the good; and (4) that the seller was given notice of the injury.

22

1  RCW 62A.2-314; *Seattle Flight Servs., Inc. v. City of Auburn*, 604 P.2d 975, 977 (Wash.

2  Ct. App. 1979).

3              ii.      Superwood is a merchant with respect to the furniture it

4  manufactured.  A "merchant" is a person who deals in goods of the kind at issue or

5  otherwise holds himself out as having knowledge or skill peculiar to the goods involved.

6  RCW 62A.2-104.  Slam Brands proved that Superwood meets this definition because

7  Superwood deals in furniture and specifically promised Slam Brands that it had the

8  knowledge and skill to produce the goods in question.  (9/24/13 Tr. (Shi Testimony) at

9  20-21.)

10             iii.     Some of the Pomeroy and DeVore products manufactured by

11  Superwood would not pass without objection under the contract description, were not of

12  average quality within the description, were not fit for their ordinary purpose, and were

13  not of even kind and quality among units.  This is described in more detail in the findings

14  of fact above, specifically in finding of fact No. 74.

15             iv.      Superwood was given notice of the injuries on numerous

16  occasions and was kept apprised of Slam Brands' injuries as they developed.  (*See, e.g.*,

17  Ex. A-62; 9/24/13 Tr. (Shi Testimony) at 66-68.)

18         c.      <u>Breach of the Implied Warranty of Fitness for a Particular Purpose</u>

19             i.      To prove a claim for breach of the implied warranty of fitness

20  for a particular purpose under Washington law, a buyer must prove that:  (1) the seller

21  had reason to know the buyer's particular purpose; (2) the seller had reason to know that

22  the buyer was relying on the seller's skill or judgment to furnish appropriate goods; and

1   (3) the buyer in fact relied on the seller's skill or judgment.  RCW 62A.2-315; *World*

2   *Wide Lease, Inc. v. Grobschmit*, 586 P.2d 889, 892 (Wash. Ct. App. 1978).

3         ii.   Slam Brands proved that Superwood knew, and had reason to

4   know, that Superwood was producing goods for Costco, which had high quality standards

5   and would not accept low-quality workmanship.  (*See, e.g.*, 9/24/13 Tr. (Shi Testimony)

6   at 21-22, 52-53.)

7         iii.   Slam Brands proved that Superwood knew, and had reason to

8   know, that Slam Brands was relying on Superwood's manufacturing skill and ability to

9   produce goods that would be accepted by Costco.  (*Id.*; *see also* Ex. 4)

10         iv.   Slam Brands did in fact rely on Superwood's skill to produce

11   goods of sufficient quality to be acceptable to Costco.  (*See, e.g.*, 9/24/13 Tr. (Shi

12   Testimony) at 21-22, 52-53; Ex. 4.)  Slam Brands provided Superwood with detailed

13   specifications and approved preproduction samples, but ultimately Slam Brands had to

14   rely on Superwood's manufacturing skill to produce the products according to those

15   specifications.  (*See* Ex. 1 ¶ 4.)

16         v.   Superwood produced the Pomeroy and DeVore products in a

17   manner that was unfit for Slam Brands' particular purpose of resale to Costco.  (9/23/13

18   Tr. at 101.)

19       d.   <u>Damages</u>

20         i.   The damages analyses for the four causes of action described

21   above are substantially the same, so the court considers them all together.  Slam Brands

22   presented evidence to support two different theories of damages at the trial.  First, Slam

1  Brands presented evidence that it suffered damages in the form of markdowns, inspection

2  costs, and other costs that flowed directly from the defective goods manufactured by

3  Superwood.  (*See* Findings of Fact No. 85-87.)  Second, Slam Brands attempted to prove

4  that it suffered damages in the form of loss of value of Slam Brands as a going concern.

5  (*See* Slam Brands Tr. Br. at 15-16; Finding of Fact No. 90.)  As explained below, Slam

6  Brands proved its first theory of damages but not its second theory.

7                    ii.     "Where the buyer has accepted goods . . . he may recover as

8  damages for any non-conformity of tender the loss resulting in the ordinary course of

9  events from the seller's breach as determined in any manner which is reasonable."  RCW

10 62A.2-714.

11                    iii.    "The measure of damages for breach of warranty is the

12 difference at the time and place of acceptance between the value of the goods accepted

13 and the value they would have had if they had been as warranted, unless special

14 circumstances show proximate damages of a different amount. . . .  In a proper case any

15 incidental and consequential damages under the next section may also be recovered."  *Id.*

16                    iv.     "Incidental damages resulting from the seller's breach include

17 expenses reasonably incurred in inspection, receipt, transportation and care and custody

18 of goods rightfully rejected, any commercially reasonable charges, expenses or

19 commissions in connection with effecting cover and any other reasonable expense

20 incident to the delay or other breach."  RCW 62A.2-715(1).

21                    v.      "Consequential damages resulting from the seller's breach

22 include (a) any loss resulting from general or particular requirements and needs of which

1  the seller at the time of contracting had reason to know . . . and (b) injury to person or

2  property proximately resulting from any breach of warranty."  RCW 62A.2-715(2).

3  Consequential damages must be reasonably foreseeable, and the test is whether the losses

4  could reasonably have been foreseen, not whether they were actually foreseen by the

5  seller.  *Lidstrand v. Silvercrest Indus.*, 623 P.2d 710, 715 (Wash. Ct. App. 1981).

6  Consequential damages may include loss of business value, damage to reputation, loss of

7  goodwill, and similar damages.  *Lewis River Golf, Inc. v. O.M. Scott & Sons*, 845 P.2d

8  987 (Wash. 1993).

9          vi.     Under Washington law, there is a foreseeability requirement

10  governing contract damages generally.  *Gaglidari v. Denny's Restaurants, Inc.*, 815 P.2d

11  1362, 1373 (Wash. 1991).  Specifically, for a breach of contract claim, a plaintiff may

12  recover damages which "may fairly and reasonably be considered either arising naturally,

13  i.e., according to the usual course of things, from such breach of contract itself, or such as

14  may reasonably be supposed to have been in the contemplation of both parties, at the time

15  they made the contract, as the probable result of the breach of it."  *Id.* (citing *Hadley v.*

16  *Baxendale*, 9 Ex. 341, 354, 156 Eng. Rep. 145, 151 (1854)).

17          vii.    Slam Brands has proved that it is entitled to certain damages

18  that flow directly from, and were caused by, Superwood's failure to produce the Pomeroy

19  and DeVore products at agreed-upon quality levels.  These damages are described in

20  findings of fact 85-87 above and consist of inspection costs, lost inventory costs, and

21  quality-related markdowns.  These expenses total $531,569.50.  All of these damages

22  resulted "in the ordinary course of events from [Superwood's] breach."  *See* RCW 62A.2-

1  714.  Further, Slam Brands has proved that it may recover these damages as

2  consequential and incidental damages under its breach of warranty claims.  *See* RCW

3  62A.2-714, 715.  Last, all of these damages meet the requirement of foreseeability

4  outlined above and found in *Gaglidari*, 815 P.2d at 1373, and *Lidstrand*, 623 P.2d at 715.

5           viii.    However, Slam Brands has not proved its second theory of

6  damages for loss of value as a going concern.  Slam Brands relies on what appears at first

7  glance to be a simple theory of damages:  Whalen agreed to buy Slam Brands for a total

8  value, including earnout, of roughly $14.5 million on December 13, 2010, but paid only

9  $5.5 million after the Pomeroy and DeVore problems materialized.  (*See* Slam Brands Tr.

10  Br. at 15-16; Finding of Fact No. 90.)  Thus, Slam Brands theorizes that Superwood

11  caused damages equal to the difference between those two numbers minus a certain

12  amount of lost value attributable to gaming markdowns for a total of $8,128,581.00 in

13  lost value.  (*See* Slam Brands Tr. Br. at 15-16.)  This theory is predicated on the notion

14  that Mr. Whalen's offers represent an accurate market valuation of Slam Brands as a

15  going concern.  (*See id.*)

16           ix.    Accepting that this theory has some logical appeal, Slam

17  Brands has not proven that it is entitled to these damages.

18           x.    First, Slam Brands has not met its burden of proving that its

19  value was only $5.5 million at the time the APA was signed.  Slam Brands was facing

20  serious challenges at that time, and the Findings of Fact and the evidence in the record

21  demonstrate that Mr. Lemelson's decision to sell Slam Brands was driven in part by a

22  fear of risks that never ultimately materialized.  (*See* Findings of Fact No. 82-96.)  Mr.

1   Lemelson faced a substantial amount of pressure as a result of the various challenges

2   facing Slam Brands, and he was offered a way out by Whalen.  (Findings of Fact No. 93-

3   95.)  That does not prove that Slam Brands suffered a loss in value of the magnitude

4   claimed by Slam Brands—fear of risk does not necessarily equate to diminished value.  It

5   is unclear from the record precisely what would have happened had Mr. Lemelson let the

6   Pomeroy and DeVore situations play out in their entirety—whether Slam Brands would

7   have become insolvent as Mr. Lemelson claims or whether it would have regained its

8   previous market position.  The court can only speculate about this.  There is no testimony

9   from Costco regarding whether it would have continued to allow Slam Brands to sell its

10  products in Costco stores.  Likewise, the court can only speculate about the precise value

11  of Slam Brands at the time it was sold to Whalen.  There is no credible evidence in the

12  record valuing Slam Brands at that time.  Further, the court doubts the usefulness of the

13  LOI as an initial valuation of Slam Brands.  The LOI reflected certain assumptions about

14  Slam Brands that turned out to be false.  Namely, the LOI had as a prerequisite that Slam

15  Brands meet a $3.2 million EBITDA[1] target for 2010.  (Ex. 14.)  Slam Brands fell short

16  of this target by roughly $1 million.  (9/27/13 Tr. (Lemelson Testimony) at 23, 25.)

17  Thus, it is not clear that the purchase price in the LOI represents an accurate market

18  valuation of Slam Brands even though there is testimony from Chuck Wilke that he

19  believed the offer was "reasonable."  (Wilke Dep. at 108.)

20

21  _____

22  [1] EBITDA is a measure of a company's profitability.  It stands for "Earnings before
    interest, taxes, depreciation, and amortization."

1            xi.      Second, the comparison between the LOI and the APA is not

2    an apples-to-apples comparison, as explained in Finding of Fact No. 97.  The two

3    agreements are vastly different.  (*Compare* Ex. 14 *with* Ex. 6.)  To begin, they were

4    structured differently.  (*Id.*)  The LOI contemplated a stock sale, whereas the APA

5    contemplated an asset sale.  (9/27/13 Tr. (Lemelson Testimony) at 12-15.)  These are

6    different transactions with very different implications for the buyer and seller alike.  (*Id.*)

7    The court has not heard sufficient testimony, expert or otherwise, to adjust the two

8    relevant offers from Whalen to account for this fact.  There were other differences as

9    well.  The LOI included a 75-day due diligence period, whereas the APA was a "no

10   questions asked" deal.  (*Id.* at 19; 9/25/13 Tr. (Lemelson Testimony) at 131-33.)  The

11   LOI had working capital requirements, whereas the APA did not.  (*Id.* at 19-22; Exs 6,

12   14.)  The LOI required Slam Brands to meet an EBITDA target of $3.2 million for 2010,

13   whereas the APA did not, and in reality Slam Brands fell nearly $1 million short of

14   meeting this target.  (Exs. 6, 14; 9/27/13 Tr. (Lemelson Testimony) at 23-25.)  The LOI

15   included a purchase of all assets, whereas the APA excluded assets, many of which

16   generated substantial revenue for Slam Brands and Mr. Lemelson.  (*Compare* Ex. 14 *with*

17   Ex. 6.)  Further, the LOI and APA had different tax implications for both the buyer and

18   the seller, including a potential $4.2 million tax benefit for Whalen under the LOI.

19   (9/27/13 Tr. (Lemelson Testimony) at 12-15, 49.)  The court can only speculate about

20   how these dramatic differences would affect the comparison between the price offered in

21   the LOI and the price offered in the APA.  There is no evidence in the record to account

22   for these differences, and this lack of evidence is fatal to Slam Brands' damages theory.

1       xii.    Third, even if the court were to accept the two flawed

2   premises described above and make a direct comparison between the LOI and the APA,

3   there is still not enough evidence for the court to rely on this damages theory.  The theory

4   requires the court to conclude that Whalen attributed roughly $8 million of lost value to

5   the Pomeroy and DeVore quality problems, roughly $2 million to gaming markdowns,

6   and none at all to any other concerns such as Slam Brands failing to meet its 2010

7   EBITDA target and associated problems with Slam Brands' financing.  There is no

8   testimony in the record about Mr. Whalen's thought process in formulating the offer.

9   Even assuming the LOI and the APA represent accurate market valuations, and even

10  ignoring the fact that the comparison between the two documents is flawed, the court still

11  must be able to apportion damages in a manner that assigns to Superwood only the

12  damages it actually caused, not damages attributable to other concerns.  The court cannot

13  do this without evidence from Mr. Whalen or someone familiar with his thinking.

14  Whalen made both of the relevant offers, but there is no testimony from Mr. Whalen or

15  anyone familiar with his thinking around the time of the deal.  It is quite possible that Mr.

16  Whalen believed Slam Brands was worth far more than the $5.5 million Whalen

17  ultimately paid.  The court can only speculate.  More fundamentally, there is no

18  competent evidence in the record to demonstrate to the court how much the difference in

19  Whalen's two offers was a result of the Pomeroy and DeVore problems and how much

20  was a result of other factors such as possible markdowns in the gaming division,

21  differences in the two agreements, or any number of other factors.  The only such

22  testimony is from Chuck Wilke, who says he believes the difference between the two

1   offers was the result of "sales levels and . . . the issues at Christmastime relative to sale."

2   (Wilke Dep. at 103.)  This is not enough.

3                xiii.    A damages award must be based on competent evidence

4   presented at trial, not on speculation, guesswork, or conjecture.  *See, e.g.*, *Shinn v. Thrust*

5   *IV, Inc.*, 786 P.2d 285 (Wash. Ct. App. 1990).  And while a damages award need not be

6   proven with mathematical certainty, the evidence must afford "a reasonable basis for

7   estimating the loss."  *Id.* at 293.  If a damages award cannot be reduced to a certainty, the

8   plaintiff must at least produce the "best evidence available under the circumstances."

9   *Jacqueline's Washington, Inc. v. Mercantile Stores Co.*, 498 P.2d 870, 871-72 (Wash.

10   1972).  Court should be "exceedingly reluctant" to immunize the defendant where the

11   fact of damages is proven but the amount cannot be ascertained.  *Id.*

12                 xiv.    Slam Brands has proved its first theory of damages, but not

13   its second.  The only way for the court to estimate the loss of value of Slam Brands as a

14   going concern would be to speculate and guess.  The court can ascertain no reasonable

15   basis grounded in competent evidence to estimate this value.  Moreover, Slam Brands has

16   not produced the best evidence available under the circumstances.  Slam Brands could

17   have elicited testimony from Ken Whalen about his thought processes relative to the LOI

18   and APA.  Slam Brands could have called a damages expert to testify about the loss of

19   value, reputation, and goodwill resulting from the Pomeroy and DeVore quality

20   problems.  It did not do these things.  The court will not speculate about the amount of

21   this form of damages, and concludes that Slam Brands has not met its burden of proof

22   with respect to its second theory of damages.

1          xv.     In addition, this theory does not describe a foreseeable loss.

2   Consequential damages of the kind claimed by Slam Brands do not occur in "the ordinary

3   course of events."  *See* RCW 62A.2-714.  These damages may not be "fairly and

4   reasonably . . . considered either arising naturally, i.e., according to the usual course of

5   things, from such breach of contract itself, or such as may reasonably be supposed to

6   have been in the contemplation of both parties, at the time they made the contract, as the

7   probable result of the breach of it."  *Gaglidari*, 815 P.2d at 1373; *Lidstrand*, 623 P.2d at

8   715.  It would not have been within the reasonable contemplation of the parties at the

9   time they signed the MPA that Superwood might cause the precipitous collapse of Slam

10  Brands to the tune of $8 million in damages simply by providing a limited number of

11  goods below the level of quality agreed upon in the MPA.  In particular, it was not

12  foreseeable given that Superwood had quality control inspectors on the ground at the

13  Superwood factory that inspected many, if not all, of the goods produced and oversaw the

14  manufacturing process.  (*See* Finding of Fact No. 67.)  To be sure, the presence of Slam

15  Brands quality control personnel at the Superwood factory did not absolve Superwood of

16  its responsibility to provide products at the agreed-upon quality level.  (Ex. 1 ¶ 4.)

17  However, it did make it unforeseeable that a comparatively small batch of non-

18  conforming products would deal a mortal blow to Slam Brands as a going concern, as

19  Slam Brands claims.  Given the circumstances as they existed in this case, the damages

20  claimed by Slam Brands for loss of value as a going concern were not foreseeable and

21  cannot be recovered.

22

1    10.    <u>Negligent and Fraudulent Misrepresentation.</u>  Slam Brands did not prove its

2    claims for negligent and fraudulent misrepresentation.

3    a.    Both of these claims require proof by clear, cogent, and convincing

4    evidence that Superwood either supplied false information to Slam Brands or else made a

5    false representation of material fact to Slam Brands.  *Bloor v. Fritz*, 180 P.3d 805, 815

6    (Wash. Ct. App. 2008) (negligent misrepresentation); *Westby v. Gorsuch*, 50 P.3d 284,

7    290-91 (Wash. Ct. App. 2002) (fraudulent misrepresentation).

8    b.    In addition, both of these claims require proof that Slam Brands

9    justifiably or reasonably relied on the false information.  *Bloor*, 180 P.3d at 815; *Westby*,

10   50 P.3d at 290-91.

11   c.    Slam Brands has not produced clear, cogent, and convincing

12   evidence that either of these elements are met.  Slam Brands alleges, and has proved, that

13   Superwood did a poor job manufacturing the Pomeroy and DeVore products.  But Slam

14   Brands did not prove that Superwood lied or provided false information.  Indeed, it is not

15   entirely clear whether Slam Brands even intends to pursue these claims at this stage.  The

16   court concludes that Slam Brands has not met its burden of proof with respect to its

17   negligent and fraudulent misrepresentation claims.

18   **<u>Summary of Amounts Owed</u>**

19   11.    The total amount Slam Brands owes Superwood is $2,654,388.00.

20   (Findings of Fact Nos. 51, 77; Conclusions of Law No. 5.)

21   12.    The total amount Superwood owes Slam Brands is $531,569.50.  (Findings

22   of Fact Nos. 85-87; Conclusions of Law No. 9(d)(vii).)

1    13.    The court previously determined that Slam Brands is entitled to contractual

2    offsets from any damages award in the amount of $552,569.04 under the MPA.  (8/15/13

3    Order (Dkt. # 93) at 14-17.)

4    14.    Thus, the net amount Slam Brands owes to Superwood is $1,570,249.46.

5    (Conclusions of Law Nos. 11-13.)

6    15.    Superwood is entitled to prejudgment interest on this amount.  Whether a

7    party is entitled to prejudgment interest turns on whether a claim is "liquidated."  *Hidalgo*

8    *v. Barker*, 309 P.3d 687, 699 (Wash. Ct. App. 2013).  "A liquidated claim is one where

9    the evidence furnishes data which, if believed, make it possible to compute the amount

10   due with exactness, without relying on opinion or discretion."  *Id.* (internal quotation

11   marks omitted).  The amounts claimed by both Superwood and Slam Brands with respect

12   to the damages awarded could be computed with exactness without recourse to opinion or

13   discretion.  (*See* Findings of Fact Nos. 51, 77, 85-87; Conclusions of Law Nos. 5,

14   9(d)(vii); 8/15/13 Order at 14-17.)  Thus, these amounts are liquidated and an award of

15   prejudgment interest is appropriate.  *Hidalgo*, 309 P.3d at 699.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

ORDER- 41

1

## III.    CONCLUSION

2          Based on the foregoing findings of fact and conclusions of law, the court

3   DIRECTS the clerk to enter judgment in favor of Superwood against Slam Brands and

4   Jason Lemelson for $1,570,249.46 plus pre-judgment interest.  By separate pleading,

5   Plaintiff shall file a motion to determine the amount of interest within 15 days of the date

6   of this order.

7          Dated this 13th day of November, 2013.

8

9

10         _____

            JAMES L. ROBART
11          United States District Judge

12

13

14

15

16

17

18

19

20

21

22

ORDER- 42